*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DAVID HENRY SERGES,

Defendant-Appellant.

FOR PUBLICATION
April 4, 2024
9:10 a.m.

No. 355554
Genesee Circuit Court
LC No. 18-042951-FC

Before: HOOD, P.J., and SWARTZLE and REDFORD, JJ.

REDFORD, J.

Defendant appeals by right his conviction of first-degree premeditated murder, MCL 750.316(1)(a); for which the trial court sentenced him to life imprisonment without the possibility of parole. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant, an admitted heroin addict who used intravenously twice per day to avoid withdrawal, made money by working odd jobs around the neighborhood in Burton, Michigan. The victim, an elderly widow, lived alone in the neighborhood. She had hired defendant in the past to work around her house and yard. On Monday November 27, 2017, a neighbor found the victim dead in her home. The medical examiner determined that she died from multiple blunt force traumas to the head and face. Police investigated the crime scene and observed a significant amount of blood located on the exterior door, garage, interior walls, furniture, counters, cabinets, and floors. The police identified a can of Raid insect killer and a hammer as the suspected murder weapons.

The victim's neighbor told the police they should consider investigating defendant. The police searched for defendant in relation to the murder and located him at his friend's house and took him into custody to the police station. Defendant waived his *Miranda*[1] rights and agreed to

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

be interviewed by Detective Eric Freeman of the Burton Police Department at the police station. During interrogation defendant admitted that he knew the victim and that he had done work for her, but he denied harming her. The police arrested defendant and held him in jail. Defendant did not post bond. The jail took defendant's clothing into custody pending his release.

While defendant remained jailed on unrelated misdemeanor charges, the police continued to investigate the victim's murder. All of the DNA and fingerprint evidence from inside of the victim's house provided no connection to defendant. The testing of defendant's clothes found in places he was known to stay did not contain any of the victim's DNA. The suspected murder weapons did not contain defendant's fingerprints or DNA. In mid-January 2018, the police sent defendant's clothing from the jail for DNA testing related to the murder. The police did not have a warrant and did not obtain defendant's consent. The Michigan State Police laboratory testing revealed the presence of human blood on defendant's pants, and DNA testing determined that one small spot of the blood matched the victim's DNA. The prosecutor then charged defendant for the victim's murder and the case went to trial. Defendant's trial counsel did not move to suppress the evidence related to defendant's pants because the minuscule amount of blood on defendant's pants did not logically connect defendant to the incredibly bloody crime scene. Defendant's first trial ended in a hung jury.

The prosecution tried defendant again in mid-September 2020 and presented evidence of the presence of the victim's blood on defendant's pants. Defendant's trial counsel again did not move to suppress that evidence and presented the same defense theory that the minuscule amount of blood on defendant's pants did not logically connect defendant to the crime. The jury convicted defendant and the trial court sentenced him. After sentencing, defendant moved for a new trial or an evidentiary hearing. Relevant to this opinion, defendant argued that the evidence of the victim's DNA found on his pants should have been suppressed because of an unconstitutional search and seizure. The trial court disagreed and denied defendant's motion. This appeal followed.

Defendant moved in this Court for remand for an evidentiary hearing to develop the record respecting his claims that his trial counsel provided him ineffective assistance by failing to object to a police detective's testimony regarding defendant's veracity and for failing to object to misrepresentations by the prosecutor, and that, because of the COVID-19 pandemic, the jury did not represent a fair cross section of the community. This Court denied the motion without prejudice.[2] Defendant renewed his motion to remand for an evidentiary hearing. This Court granted the motion and remanded to the trial court for an evidentiary hearing to determine whether defendant was denied the effective assistance of counsel. This Court limited the matters for the trial court's consideration on remand to: "(1) the admissibility of the forensic analysis of defendant's clothing worn when he was detained on or about November 30, 2017; and (2) whether trial counsel provided defendant effective assistance by not moving to suppress evidence of the

---

[2] *People v Serges*, unpublished order of the Court of Appeals entered February 2, 2022 (Docket No. 355554).

forensic analysis of defendant's clothing." This Court also permitted the parties to file supplemental briefs addressing the issues raised on remand.[3]

On remand, defendant moved for a new trial on several grounds including that the police conducted an unconstitutional warrantless search that affected defendant's substantial rights, and alternatively that defense counsel provided ineffective assistance by failing to move to suppress. Defendant also asserted that trial counsel provided ineffective assistance by not objecting to the prosecution's elicitation of testimony regarding defendant's veracity. Defendant contended further that the jury did not represent a fair cross section of the community because of COVID-era jury-selection procedures.

The trial court conducted an evidentiary hearing at which defendant's trial attorney, David Clark, and Detective Freeman testified. Clark testified that he represented defendant in both trials. He affirmed that he knew about the prosecution's evidence regarding defendant's pants including testimony by forensic scientists about tests performed on the pants and the results. He admitted that he did not move to suppress such evidence. He explained that the prosecution claimed that defendant stood over the victim and struck her with a hammer and a Raid can causing blood to go all over the room, and that the prosecution intended to present defendant's pants to show that they had blood on them. Clark asserted that, had defendant done as the prosecution contended, his pants would have been covered in blood because the crime scene was particularly bloody, but evidence established that defendant never changed his pants around the time of the murder. Clark explained that defendant's pants only had a minuscule spot of the victim's blood and he had no blood on his shoes. Clark stated that defendant's pants actually worked to the prosecution's detriment. Consequently, he did not move to suppress that evidence.

During cross-examination, Clark affirmed that defendant's first trial ended in a hung jury. That did not impact the defense strategy respecting defendant's pants. Defendant's conviction surprised Clark. On further direct examination, Clark testified that he did not think defendant guilty or capable of such a horrendous crime. He thought that the prosecution did not have evidence to convict. He stated that he believed that the pants worked in defendant's favor because, if defendant had pounded the victim, he would have been covered in blood. He believed that the pants worked to defendant's advantage.

Detective Freeman testified that defendant became a person of interest in the victim's homicide investigation, and once located, he and another officer arrested defendant on suspicion of homicide. Defendant wore the same pants seen on surveillance videos in the area. Detective Freeman interviewed defendant. Police then transported defendant to the City of Flint lockup to lodge him in jail on suspicion of homicide. Although he did not personally transport defendant to the lockup, he knew from experience that defendant's clothes would have been taken and he would have been given jail clothing. Defendant's clothes were collected from the jail by the police the next day. Detective Freeman stated that he noticed "some stuff on his pants that appeared to be blood. So he—we discussed that at the office and decided that we needed to take his, his belongings at that time." Defendant's clothes were transported to the police station and secured

---

[3] *People v Serges*, unpublished order of the Court of Appeals entered December 21, 2022 (Docket No. 355554).

-3-

as evidence. Detective Freeman said that he sought a warrant but the prosecutor denied the request and wanted further investigation.

Detective Freeman testified that items collected at the crime scene were sent first to the Michigan State Police lab for testing. Defendant's pants and other items collected from him were included in the second set of items sent on January 19, 2018, to the crime lab for testing. Three sets of items in all were sent separately because they could only send seven items at a time to the lab for testing and the prosecutor had to request sending additional items. Detective Freeman testified that defendant's jeans were in police custody and secured as evidence the entire time. He stated that the prosecutor issued a warrant the second time police requested one.

On cross-examination, Detective Freeman affirmed that the victim was found on November 27, 2017, and that on the 29th the police put out a media release. He affirmed that the police located defendant on the 29th. Detective Freeman affirmed that the police considered defendant a person of interest in the murder investigation, and within 48 hours of his apprehension the police requested the prosecutor's office to press charges because the murder charges were not authorized at that point. Detective Freeman testified that defendant remained in jail on outstanding warrants. Detective Freeman affirmed that a police report indicated that defendant was arrested on his outstanding warrants, but he attested that defendant was arrested for murder. He asserted that that police arrest report existed but was incorrect. He affirmed that the day after defendant's arrest he requested that the sheriff turn over all of defendant's property which got collected and secured by the police as evidence. Detective Freeman affirmed that defendant's pants were not sent to the crime lab until January 2018.

Detective Freeman also affirmed that he interviewed defendant at the police station and that he testified at the preliminary examination that he stepped out of the room and observed defendant brushing off his legs. Detective Freeman affirmed that he had testified that such conduct indicated deception.

On further direct examination, Detective Freeman explained that the prosecutor agreed to issue a warrant because the police had more evidence, more witnesses came forward, and a gas station's surveillance video placed defendant in the area establishing a time link to the crime. Detective Freeman affirmed that completion of the DNA testing on defendant's pants occurred on March 8, 2018, and the results were e-mailed to the police on or around that date.

The trial court asked Clark to return to the podium for some questioning by the court. The court described its recollection of the evidence at trial regarding the very bloody crime scene. The court asked Clark if he discussed the defense strategy with defendant. Clark affirmed that he had done so and that they agreed to the strategy that, had defendant murdered the victim, his pants would have had more than a dot of her blood, and they intended to use the pants against the prosecution's case. Clark affirmed and explained that defendant had worked for the victim a number of times. Clark affirmed that the trial strategy included that defendant came in contact with the victim's blood on another occasion when he worked for the victim who had medical problems including diabetes and bleeding of her feet, plus her house was not kept well. Clark acknowledged again that he consulted with defendant regarding the trial strategy to use the pants against the prosecution's case. Clark did not recall if he informed defendant that a Fourth Amendment ground to exclude the pants may have existed.

-4-

After the hearing, the parties submitted supplemental briefs to the trial court. A few months later, the court reconvened the hearing to render its decision. The court recounted the two trial outcomes and observed that the suppression of defendant's pants did not seem as straightforward as defense counsel argued. The court stated that it did not know if it would have granted a motion to suppress under the circumstances presented in the case. On reflection it felt inclined that it would not have granted such a motion. The court then noted that caselaw provided a presumption that counsel performed effectively. The court considered the standard set forth in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The court recalled the evidence of the brutal, bloody crime scene. The court noted that Clark testified that he did not consider filing a motion to suppress since, after discussing the defense theory with defendant, they agreed upon a trial strategy that considered the pants favorable to defendant and detrimental to the prosecution because, had defendant been at the crime scene, he would have had more than a dot of blood on himself. The court applied the *Strickland* standard and concluded defendant's trial counsel followed a reasonable trial strategy and had provided defendant effective assistance. The court noted that defendant's first trial ended in a hung jury which indicated that the strategy was good enough to cause at least one juror to pause. For those reasons, the court denied defendant's motion.

## II. PRESERVATION AND STANDARD OF REVIEW

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). In this case, at trial, defendant did not move to suppress or otherwise object to the admission of the evidence related to the victim's blood found on his pants. Consequently, he failed to preserve this issue. *Id*.

We review de novo questions of constitutional law and a trial court's decision on a motion to suppress evidence. *People v Joly*, 336 Mich App 388, 395; 970 NW2d 426 (2021). When the issue is preserved, "[a] trial court's factual findings made when ruling on a motion to suppress are reviewed for clear error." *People v Woodard*, 321 Mich App 377, 382; 909 NW2d 299 (2017). However, because this issue is unpreserved, we must review the "unpreserved claim for plain error affecting defendant's substantial rights." *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (citation omitted). To establish that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (citation omitted).

## III. ANALYSIS

Defendant argues that plain error warrants reversal and a new trial because taking and testing his pants constituted an unconstitutional seizure and search. We disagree.

"Both the United States Constitution and the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures." *People v Pagano*, 507 Mich 26, 31-32; 967 NW2d 590 (2021), citing US Const, Am IV; Const 1963, art 1, § 11. "The lawfulness of a search or seizure depends on its reasonableness." *People v Moorman*, 331 Mich App 481, 485; 952 NW2d 597 (2020) (quotation marks and citation omitted). "A search occurs under the Fourth Amendment when 'the government violates a subjective expectation of privacy that society recognizes as reasonable.' " *People v Abcumby-Blair*, 335 Mich App 210, 230; 966 NW2d 437 (2020), quoting *Kyllo v United States*, 533 US 27, 31-33; 121 S Ct 2038; 150 L Ed 2d 94 (2001). "In comparison, '[a] "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.' " *Woodard*, 321 Mich App at 383, quoting *United States v Jacobsen*, 466 US 109, 113; 104 S Ct 1652; 80 L Ed 2d 85 (1984). "Ordinarily, searches or seizures conducted without a warrant are unreasonable per se, and when evidence has been seized in violation of the constitutional prohibition against unreasonable searches and seizures, it must be excluded from trial." *Woodard*, 321 Mich App at 383 (quotation marks and citation omitted). However, "several exceptions exist such that a warrant is not always required." *People v Anthony*, 327 Mich App 24, 34; 932 NW2d 202 (2019). Therefore, to establish that a search complied "with the Fourth Amendment, the police must show either that they had a warrant or that their conduct fell within one of the narrow, specific exceptions to the warrant requirement." *Moorman*, 331 Mich App at 485 (citation omitted).

"[A] search warrant is not always required before searching or seizing a citizen's personal effects." *People v Hughes*, 506 Mich 512, 524-525; 958 NW2d 98 (2020) (citation omitted). "However, there is a strong preference for searches conducted pursuant to a warrant, and the general rule is that officers must obtain a warrant for a search to be reasonable under the Fourth Amendment." *Id*. (quotation marks and citations omitted). "One of the narrow, specific exceptions to the warrant requirement is searches incident to arrest." *People v Eaton*, 241 Mich App 459, 461-462; 617 NW2d 363 (2000). "There are two historical rationales for the 'search incident to arrest' exception to the warrant requirement of the Fourth Amendment: (1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial." *Id*. at 462 (citation omitted); see also *People v Nguyen*, 305 Mich App 740, 756; 854 NW2d 223 (2014), quoting *Knowles v Iowa*, 525 US 113, 116; 119 S Ct 484; 142 L Ed 2d 492 (1998). "Fundamental to the search incident to arrest exception is the requirement that there must be a lawful arrest in order to establish the authority to search." *Eaton*, 241 Mich App at 463.[4] "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional

---

[4] In *People v Gonzales*, 356 Mich 247, 253; 97 NW2d 16 (1959), our Supreme Court adopted the definition of "arrest" stated in 4 Am Jur, Arrest, § 2:

> An arrest is the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest. The act relied upon as constituting an arrest must have been performed with the intent to effect an arrest and must have been so understood by the party arrested.

justification. It is the fact of the lawful arrest which establishes the authority to search . . . ." *Id*. (quotation marks and citation omitted).

In this case, a neighbor found the victim dead in her home. The police began investigating defendant as a murder suspect shortly after the medical examiner determined the victim's death a homicide caused by blunt force trauma to her head and face. At trial, Detective Freeman testified that he went to speak with defendant during the murder investigation and arrested defendant.

In his motion for a new trial or a *Ginther*[5] hearing, defendant provided the trial court with additional information including a register of actions from District Court Case No. 16-F01452 related to a charge of unlawful entry for which police arrested defendant on July 11, 2016, and he obtained his release on July 15, 2016, after posting bond. The court required defendant to appear for an arraignment on September 19, 2016, but he failed to do so. On September 21, 2016, the court issued a warrant for his arrest. Detective Freeman, however, testified at the evidentiary hearing conducted on remand that he and another officer arrested defendant on November 30, 2017, on the suspicion of murder. The later police report written by another officer stated that defendant was arrested and held on the September 2016 bench warrant. Detective Freeman testified at the evidentiary hearing that the police report was incorrect. The testimony at trial coupled with the testimony at the evidentiary hearing, when closely analyzed, reveal that evidence obtained during the police investigation placed defendant in the vicinity of the crime around the time of the murder. The police conducted a search for defendant and their efforts to locate him were made related to the murder investigation and were not done in relation to the outstanding warrant for defendant's arrest because of misdemeanors.

Detective Freeman testified at trial that, when arrested, defendant donned a pair of dark colored pants. Defendant's pants and other belongings were taken by guards when defendant was jailed. The record does not contain any information about any search of those pants at the time they were removed from defendant and he changed into his jail garb; but the day after he went to jail, the police took his clothing into custody as evidence in the murder investigation. On January 18, 2018, defendant pleaded guilty to a reduced charge of attempted unlawful entry in Case No. 16-F01452. The court sentenced defendant to 45 days in jail with credit of 45 days for time served. Neither party appears to dispute that defendant remained in jail after January 18, 2018. The record reflects that the prosecution had not yet charged defendant for the victim's murder.[6] On January 19, 2018, an evidence technician submitted some of defendant's clothing

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[6] The presentence investigation report (PSIR) indicates that police arrested defendant on January 18, 2018, in District Court Case No. 18-F00053, for allegedly committing "Theft by False Token/Coin or False Pretense" on November 22, 2017. The PSIR does not indicate if defendant was able to be released on bond. We take judicial notice of available public records from Genesee County showing that the court set defendant's bond at $75,000 cash or surety on January 18, 2018. MiCOURT Case Search, *Record for Defendant in District Court Case No. 18F00053* <https://micourt.courts.michigan.gov/case-search/court/D67> (accessed October 13, 2022). We are permitted to take judicial notice of this information, considering it is readily available as a

taken from him when jailed for laboratory testing by Theresa Scott, a Michigan State Police laboratory employee and expert in bodily fluid identification. The laboratory examination report stated: "These were the items collected from the suspect on the day he was arrested." Detective Freeman requested that the clothing worn by defendant when arrested November 30, 2017, be taken to the police laboratory and searched. Detective Freeman explained that defendant's clothing went in three separate sets to the laboratory for testing and defendant's pants went in the second set. The Burton Police Department did not obtain defendant's consent nor a search warrant. The parties disagree whether a warrant was required.

On remand, at the evidentiary hearing, Detective Freeman testified that, during investigation of the victim's murder, police searched for defendant, located him, arrested him on suspicion of murder, and took him to the police station. After interviewing defendant, the police transported defendant to the local jail at which defendant's clothes were taken incident to his arrest. Detective Freeman testified unequivocally that defendant was arrested for the murder. Defendant's detention and jailing arose in relation to the murder investigation and not any investigation of his pending misdemeanors. The two aspects of defendant's placement in jail appear to have intersected coincidentally. In any event, the record supports that defendant's pants were taken incident to his lawful arrest which gave the police authority to search them. *Eaton*, 241 Mich App at 463; *Nguyen*, 305 Mich App at 756.

Scott testified during trial that she examined defendant's pants under ambient light and then under bench light with a magnifying glass that enabled her to locate spots. Scott then took steps to determine whether the stains were caused by human blood by rubbing the stains with filter paper, then testing the filter paper. Scott determined that spots on the front of both legs of defendant's pants indicated the presence of human blood. Once Scott identified areas with human blood present, she swabbed those areas to get a sample, and forwarded the swabs to another laboratory employee who performed DNA analysis. According to a laboratory report completed by Heather Goff, a Michigan State Police laboratory employee, an expert in bodily fluid identification and DNA, the swabs were received for further testing on February 21, 2018. The blood swab taken by Scott from the front of the right pant leg had a major and minor contributor of DNA. Goff reported that the victim was the major contributor, while the minor contribution was insufficient for comparison. Goff completed her report on March 8, 2018. The prosecution issued the felony warrant and felony complaint charging defendant with the victim's murder four days later, on March 12, 2018.

Initially, the parties disagree regarding whether a search or seizure, as contemplated under the Michigan and United States Constitutions, actually occurred in this case. The disagreement is focused on whether defendant maintained a possessory interest and reasonable expectation of privacy respecting his pants considering that the jail guards took them when defendant was jailed on November 30, 2017. Defendant does not challenge the jail's seizure of his clothing, including

---

public record. MRE 201; *Petersen Fin, LLC v City of Kentwood*, 337 Mich App 460, 483 n 7; 976 NW2d 691 (2021). On March 15, 2018, defendant pleaded *nolo contendere* to the charge of "Theft by False Token/Coin or False Pretense" in District Court Case No. 18F00053 and was sentenced to 90 days in jail.

the pants, incident to his arrest and jailing. Instead, defendant insists that taking his pants to the laboratory and subjecting them to bodily fluid identification and DNA testing constituted a new seizure and search of the pants for which the police had no warrant. The prosecution counters that the police did not interfere with his possessory interest in the pants while he was in jail and defendant lost any reasonable expectation of privacy in the pants once they were taken by the jail. The prosecution contends that no unlawful seizure or search occurred when the pants were taken from the jail to the laboratory and tested for the presence of blood and DNA analysis.

In *Woodard*, 321 Mich App at 383, this Court explained:

"[A] search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *People v Antwine*, 293 Mich App 192, 195; 809 NW2d 439 (2011) (quotation marks and citation omitted). In comparison, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v Jacobsen*, 466 US 109, 113; 104 S Ct 1652; 80 L Ed 2d 85 (1984). The touchstone of these protections is reasonableness, which "is measured by examining the totality of the circumstances." [*People v* ]*Williams*, 472 Mich [308,] 314[; 696 NW2d 636 (2005)].

Defendant contends that *People v Carr*, 370 Mich 251, 253; 121 NW2d 449 (1963) and *People v Trudeau*, 385 Mich 276; 187 NW2d 890 (1971), cert den 405 US 965 (1972), support his position. Those cases, however, are distinguishable from the facts in this case.

In *Carr*, 370 Mich at 253, our Supreme Court considered the defendant's appeal of his conviction of breaking and entering with the intent to commit larceny. Initially, police arrested the defendant for driving with a defective taillight and police found stolen property in the car. *Id*. The defendant pleaded guilty to a charge of possession of stolen property and was sentenced to serve 30 days in jail. *Id*. at 253-254. While jailed, the defendant's car was stored in the jail's parking lot. *Id*. at 254. During his time in jail, the police interviewed the defendant about the larceny of liquor from a store. *Id*. When the defendant failed to provide any useful information, the police performed a warrantless search without his consent of the defendant's car sitting in the jail's parking lot. *Id*. In the process of the search, the police removed a monkey wrench from the car, took the car to a different county, conducted tests on the car, performed evaluations of the tracks from the car's tires, and took paint scrapings from the car and wrench for further testing. *Id*. Meanwhile, the defendant remained in jail for his possession of stolen property conviction. *Id*. After conducting those tests, the police charged the defendant with breaking and entering with the intent to commit larceny. Following his conviction and sentencing for that offense, the defendant appealed. *Id*.

Our Supreme Court considered whether the trial court should have suppressed the evidence obtained from the police's warrantless search of the defendant's car while he was in jail. *Id*. at 255. The Court reasoned:

It could not be seriously urged that the search and seizure made by the officers without [the] defendant's consent or without a search warrant could not, nor likely would not even have been attempted, had defendant been at liberty and

-9-

his automobile been parked on his own premises. Defendant was not stripped of his civil rights and his constitutional safeguards merely because he was serving a sentence in the county jail for an unrelated misdemeanor. It would be a dangerous rule of law and an invitation to circumvent the constitutional guaranty against unreasonable search and seizure were the citizen convicted of a misdemeanor and in jail, possibly in default of payment of a fine to be stripped of all his civil liberties. [*Id*.]

The Court made clear that it did not impinge upon the right of an "officer to search and to seize without a search warrant under circumstances where he has probable cause to believe a felony was committed." *Id*. Further, a jail guard may search for items that might be used to escape from incarceration. *Id*. at 255-256. Our Supreme Court focused on the police action of searching the defendant's car when an interview of the defendant had not produced any probable cause for the search. *Id*. at 256. Our Supreme Court concluded:

Here a search of the defendant's possession—his automobile was made without a search warrant, without cause, probable or otherwise related to the alleged crime, without any basis other than possibly understandable suspicion. Such search and seizure was made in patent violation of the State Constitution of 1908, art 2, § 10. The fruits of that search, timely objected to by defense counsel, were inadmissible on the trial. [*Carr*, 370 Mich at 256.]

The Court, therefore, set aside the defendant's conviction and remanded the case for a new trial. *Id*.[7]

In *Trudeau*, 385 Mich 276, our Supreme Court considered whether the police could rely on evidence seized from the possession of a defendant jailed on an unrelated charge. On November 6, 1967, a night watchman at a synagogue was killed during an attempted burglary. *Id*. at 278. "One of the few leads available was a heel print left at the scene." *Id*. Police arrested the defendant on November 19, 1967, on unrelated charges for breaking and entering to commit larceny at a post office. *Id*. at 277. The officer investigating the watchman's murder went to the courthouse during the defendant's preliminary examination for the unrelated charges. *Id*. at 278. The officer apparently believed that the two crimes were similar and wanted to look at the heels of the defendant's shoes. *Id*. The officer removed the defendant from the holding cell at the courthouse and asked him to lift his feet so the officer could see his shoes' heels. *Id*. The defendant complied. *Id*. Later the same day, police officers asked the defendant to give the shoes to the police, but the defendant refused. *Id*. The police took the shoes anyway, without a warrant. *Id*. After significant testing, an expert witness determined that the defendant's shoes matched the heel print from the synagogue which led to the defendant being charged with the night watchman's murder. *Id*. at 279-280. The defendant unsuccessfully moved to suppress the evidence and quash the charges against him. *Id*. at 278. The prosecution used the evidence at trial, which led to the defendant's conviction of second-degree murder. *Id*. at 278-279. This Court affirmed. Our Supreme Court granted leave to consider whether evidence related to the defendant's shoes should

---

[7] Our Supreme Court decided the case on Michigan Constitutional grounds and declined to consider federal precedent when analyzing the issue. *Id*. at 256-257.

have been suppressed. *Id*. at 279. The Court first analyzed whether a seizure had occurred. *Id*. at 280. The prosecution argued that the plain or open-view exception to the rule requiring a warrant for a seizure of property applied in the case after the police officer looked at the bottom of the defendant's shoe. *Id*. at 279. The Court noted that the police had not established probable cause to believe that the shoes were connected to the murder of the night watchman until *after* the laboratory conducted its week-long investigation. *Id*. at 280. This meant that the police officer's plain view of the shoes had not amounted to probable cause to believe the shoes were related to the murder, thereby belying the prosecution's reliance on the plain-view exception to the warrant requirement. *Id*. Next, the Court considered whether the defendant being in jail at the time of the search and seizure changed the outcome. *Id*. Relying on *Carr*, 370 Mich at 255, the Court held that the defendant "did not lose his civil rights or liberties while he was in police custody awaiting trial on another charge." *Trudeau*, 385 Mich at 281. The Court reversed the defendant's conviction and remanded for a new trial. *Id*.[8]

Defendant argues that *Trudeau* and *Carr* govern this case. Analysis of the totality of the circumstances in this case, however, reveals that those cases are distinguishable from the case at bar. In *Trudeau* and *Carr*, the items searched remained in the defendants' respective custody and control. See *Carr*, 370 Mich at 255; *Trudeau*, 385 Mich at 281; see also *People v Nesbitt*, 159 Mich App 740, 743-744; 407 NW2d 4 (1987) (distinguishing *Trudeau* in part because the "defendant's boots were taken from him as a matter of departmental policy concerning the processing of prisoners, while the *Trudeau* defendant was required to give his shoes to the police, despite his refusal to do so."). In *Trudeau*, the police did not take an imprint from the defendant's shoes while the shoes were in custody of the jail; the police took him out of the bullpen while at court for another case and took the shoes off of his feet. *Trudeau*, 385 Mich at 278, 281. The holding in *Trudeau* intimates that there may not have been a constitutional deficiency if the police took the shoes during processing. *Id*. at 281, citing *United States v Wade*, 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967). Likewise, in *Carr*, the police searched the defendant's vehicle while parked in the jail parking lot, and the facts summarized in the case do not indicate that the defendant's car had been impounded by the police. See *Carr*, 370 Mich at 253-254. The opinion acknowledged that the record was unclear as to the circumstances under which it was stored in the parking lot. *Id*. The Court clarified that the state searched the vehicle "without process of any kind," *id*. at 254, which suggests that the search was not an inventory search, or made pursuant to an impounding or inventory policy. *Id*. In other words, it seems that the defendant in *Carr*, like the defendant in *Trudeau*, continued to possess and hold dominion over the car.

In this case, the police searched for defendant and arrested him in relation to the victim's murder. The police interviewed defendant. During the interview, defendant provided conflicting explanations of his whereabouts and actions at times relevant to the murder. During a break in his interview Detective Freeman observed defendant on camera rubbing his pants and heard him make a statement to himself. Evidence obtained during the investigation connected defendant to the

---

[8] Our Supreme Court decided *Trudeau* after the adoption of Michigan's Constitution in 1963. *Id*. As in *Carr*, the *Trudeau* Court clarified that it was not "in any way affecting essential steps which must be taken by the police in processing a prisoner . . . and to assure the protection of the police and of other prisoners." *Trudeau*, 385 Mich at 281.

location of the crime around the time of the murder. The police transported defendant to jail where the jail took his clothing pursuant to jail policy. The police collected his clothing as evidence in the murder investigation the next day. Defendant remained in jail on the unrelated charges and the police conducted further investigation of the murder including having a series of tests performed on defendant's belongings while he remained in jail. The record reflects that the police sent defendant's clothes to the Michigan State Police laboratory where they were inspected and tested, solely related to the victim's murder. The *Trudeau* Court determined that the taking of the defendant's shoes from his actual possession while he was in jail on an unrelated charge constituted a seizure. The defendant in *Trudeau* obviously had a reasonable or justifiable expectation of privacy in the shoes on his feet. This case differs from *Trudeau* in that defendant's pants and other clothing and belongings were not in his possession. They were previously taken by the jail in relation to his lawful arrest. Defendant had no reasonable or justifiable expectation of privacy in them after taken by the jail.

The laboratory testing on the automobile in *Carr* is also distinguishable because the automobile merely had been placed in storage and not seized as evidence incident to the defendant's arrest. The defendant continued to have a reasonable expectation of privacy related to his parked and stored automobile. Here, however, defendant cannot be said to have retained any expectation of privacy in the pants taken from him related to his arrest and detention in jail. Defendant's pants were lawfully seized when they were taken from him at the jail. The police took defendant's belongings including his pants into custody as evidence in relation to the murder. As explained in *People v Custer*, 465 Mich 319, 337; 630 NW2d 870 (2001),

> Once the police lawfully have possession of an object, there is no need for the police to obtain a search warrant to look at or scrutinize the exterior of that object. This is true because once the police lawfully take possession of an object, one's expectation of privacy with respect to that object has "at least partially dissipated. . . ." [citing and quoting *People v Rivard*, 59 Mich App 530, 533-534; 230 NW2d 6 (1975).

In this case, the police lawfully took plaintiff's clothes and secured them as evidence in relation to the victim's murder and later lawfully searched the pants by sending them to the Michigan State Police laboratory for testing. The police did not meaningfully interfere with defendant's possessory interest or violate his expectation of privacy in his clothing once they collected his clothing after a lawful arrest. As part of that lawful seizure, "it is plainly within the realm of legitimate police investigative technique to subject objects properly seized as evidence of crime to scientific testing and examination." *People v Cook*, 24 Mich App 401, 409; 180 NW2d 354 (1970); *Custer*, 465 Mich at 337.

In *Hudson v Palmer*, 468 US 517, 528; 104 S Ct 3194; 82 L Ed 2d 393 (1984) (quotation marks and citation omitted), a case involving a shakedown search of a prisoner's locker and cell for contraband, the United States Supreme Court explained that "[l]oss of freedom of choice and privacy are inherent incidents of confinement." The Court held that the prisoner did not have a reasonable expectation of privacy in his prison cell enabling him to invoke the protections of the Fourth Amendment. See also *Lanza v New York*, 370 US 139, 143; 82 S Ct 1218; 8 L Ed 2d 384 (1962) (holding that the fact of arrest and incarceration abates all legitimate Fourth Amendment privacy and possessory interests in personal effects). As Justice O'Connor observed in her

concurrence in *Hudson*, "if the act of taking possession and the indefinite retention of the property are themselves reasonable, the handling of the property while in the government's custody is not itself of Fourth Amendment concern. The nonprivacy interests protected by the Fourth Amendment do not extend beyond the right against unreasonable dispossessions." *Hudson*, 468 US at 538, 539.

In *United States v Edwards*, 415 US 800, 802; 94 S Ct 1234; 39 L Ed 2d 771 (1974), the United States Supreme Court explained that "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." "Nor is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis or that the test results are admissible at trial." *Id*. at 803-804. The length of time between arrest and searching, the Court concluded, was not dispositive considering the defendant and his clothing were constantly in custody of the police during the relevant time period. *Id*. at 806-807; see also *Nesbitt*, 159 Mich App at 743-744 (1987) (distinguishing *Trudeau* because the defendant's boots were taken from him as a matter of departmental policy concerning the processing of prisoners); and *People v Brooks*, 405 Mich 225, 244-249; 274 NW2d 430 (1979) (explaining that it is not unreasonable for police to examine and hold as evidence the personal effects of an accused in their lawful custody as the result of a lawful arrest).

In this case, because defendant was in custody at the time his pants were sent to the laboratory for testing, even though such occurred more than one month after his arrest, no second seizure of them occurred as defendant contends. There is no question that the state had custody of the pants and defendant did not. Although he could potentially regain custody of the pants after his release, he did not have custody of them at the time they were searched. The police could take, examine, and preserve defendant's clothing for use as evidence, just as they are normally permitted to seize evidence of a crime when it is lawfully encountered. *Edwards*, 415 US at 806. We are unconvinced that the trial court committed plain error by admitting defendant's pants and the laboratory test results as evidence in this case. The record indicates that the pants were appropriately seized at the place of detention and later subjected to laboratory analysis and the test results were admissible at trial. Because defendant has failed to establish plain error, he is not entitled to relief.

Even supposing the trial court committed plain error, we may reverse "only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Randolph*, 502 Mich at 10 (citation omitted). The record does not establish defendant's actual innocence, nor does the record reflect an error that seriously affected the fairness, integrity or public reputation of judicial proceedings independent of defendant's innocence. Accordingly, we are not persuaded that grounds exist to vacate his conviction and remand the case for a new trial.

Defendant alternatively contends that his trial counsel provided ineffective assistance by not moving to suppress the evidence of the victim's blood on his pants. We disagree.

"To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) that his attorney's performance was objectively unreasonable in light of prevailing professional norms;

and (2) that he was prejudiced by the deficient performance." *People v Walker*, 497 Mich 894, 895; 855 NW2d 744 (2014). To show prejudice, a defendant "must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *People v Gaines*, 306 Mich App 289, 300; 856 NW2d 222 (2014) (quotation marks and citation omitted). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694. "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012) (quotation marks and citation omitted). This Court will not substitute its judgment for counsel's judgment as to trial strategy. *People v Cooper*, 309 Mich App 74, 81; 867 NW2d 452 (2015). Nor will this Court "assess counsel's competence with the benefit of hindsight." *People v Petri*, 279 Mich App 407, 411; 760 NW2d 882 (2008) (citation omitted). "A failed strategy does not constitute deficient performance." *Id*. at 412 (citation omitted). Further, defense counsel is not required to make a meritless objection. *People v Chelmicki*, 305 Mich App 58, 69; 850 NW2d 612 (2014). Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel. *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000). Failing to file a suppression motion is not per se ineffective assistance; a defendant must still demonstrate that his lawyer's performance was objectively unreasonable and that "but for" that deficient performance, the outcome of the trial would have been different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

In this case, the record indicates that defense counsel's performance was not objectively unreasonable under the circumstances. The seizure of defendant's pants occurred incident to his lawful arrest and the police took the pants into custody in relation to the murder investigation. The testing occurred while defendant remained detained. Further, Clark testified that, in consultation with defendant, they agreed to a defense trial strategy that used defendant's pants' minuscule spot of the victim's blood against the prosecution's case by demonstrating that the evidence could not logically establish that defendant committed the brutal, bloody murder of the victim because defendant would have been covered in blood. This trial strategy apparently worked in defendant's first trial which resulted in a hung jury. That defendant and his trial counsel chose to rely on the same defense strategy in his second trial which resulted in his conviction, does not render the strategy unsound nor does it constitute deficient performance. *Petri*, 279 Mich App at 412. Accordingly, defendant has failed to meet his burden to overcome the presumption that his trial counsel provided him effective assistance. The trial court's ruling following the evidentiary hearing on remand, that Clark provided defendant effective assistance, is supported by the record.

Moreover, had defense counsel moved to suppress the pants evidence, such motion likely would have failed considering that the totality of the circumstances in this case indicates that defendant had no reasonable or justifiable expectation of privacy regarding his pants once taken from him by the jail. Defendant has failed to establish that his trial counsel's performance was objectively unreasonable or that, but for that deficient performance, there is a reasonable probability the outcome of the trial would have been different. *Trakhtenberg*, 493 Mich at 51.

Defendant next argues that the trial court erred by admitting Detective Freeman's testimony that defendant's conduct during his interview indicated deception and that the prosecution committed prosecutorial misconduct by eliciting such testimony. Alternatively, he argues that his trial counsel provided ineffective assistance by not objecting. Defendant's arguments lack merit.

"The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls outside the range of principled outcomes." *Thorpe*, 504 Mich at 251-252 (quotation marks and citations omitted). "A decision on a close evidentiary question ordinarily cannot be an abuse of discretion. *Id*. at 252 (citation omitted). When preserved, "[c]laims of prosecutorial misconduct are generally reviewed de novo to determine whether the defendant was denied a fair trial." *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). However, when issues are unpreserved, this Court must review the "unpreserved claim for plain error affecting defendant's substantial rights." *Roscoe*, 303 Mich App at 648. Defendant failed to object to the prosecution's question or Detective Freeman's testimony and did not raise this issue before the trial court. Therefore, he did not preserve it. Accordingly, we review it for plain error. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763 (citation omitted). To establish that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 463-464. Defendant's alternative argument of ineffective assistance of counsel similarly requires him to prove prejudice to warrant reversal of his convictions and a new trial. *Walker*, 497 Mich at 895. "Where, as here, there has been no evidentiary hearing on the issue below . . . our review is limited to errors apparent on the record." *People v Seals*, 285 Mich App 1, 19-20; 776 NW2d 314 (2009) (citation omitted).

"A witness may not comment on, or vouch for, the credibility of another witness." *People v Lowrey*, 342 Mich App 99, 70; 993 NW2d 62 (2022). "A witness may not opine about the defendant's guilt or innocence in a criminal case." *Id*., quoting *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012). "Such conduct 'invade[s] the province of the jury to determine' issues in a case." *Lowrey*, 342 Mich App at 70 (quotation marks and citation omitted). "Nevertheless, a police officer may testify about his or her perceptions, during the course of an investigation, of whether a defendant was being truthful." *Id*.

In this case, Detective Freeman interrogated defendant after he was arrested and brought to the police station. Defendant waived his *Miranda* rights. After defendant repeatedly denied any involvement in the victim's murder, Detective Freeman left the room. While outside of the room, Detective Freeman watched defendant on a live-feed camera. The prosecution asked Detective Freeman: "And when you stepped out and you watched that live feed, did [defendant] do something unusual?" Detective Freeman responded that he saw defendant brush off the top of his pants and offered that, in his experience and training, such indicated defendant was being deceptive. He stated further that he heard defendant state to himself, "they're not going to pin this on me." Defendant did not object to the question or the witness's response.

The record does not indicate that the prosecution sought to elicit improper testimony, and after Detective Freeman responded to the question, the prosecution moved on and did not focus on or repeat at any time during the trial or in closing argument Detective Freeman's statement regarding his perception of defendant's deceptive conduct. "Generally, '[p]rosecutors are accorded great latitude regarding their arguments and conduct.' " *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (citation omitted). Even assuming that the prosecution erred by

-15-

asking Detective Freeman regarding defendant's conduct while alone in the interview room, and the trial court erred by admitting the statement regarding defendant's conduct indicating deception, we are not convinced that such plain error affected the outcome of the proceedings.

The record reflects that Detective Freeman served as 1 witness out of 11. The prosecution presented a significant amount of evidence from which a jury could find defendant guilty beyond a reasonable doubt of the charged offense. Defendant has failed to establish that the stray remark caused defendant prejudice, i.e., that the error affected the outcome of the lower court proceedings. He has not shown that the plain, forfeited error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity or public reputation of judicial proceedings independent of his innocence. Defendant, therefore, has failed to establish that reversal is warranted.

We are also unpersuaded that defendant's trial counsel's performance was objectively unreasonable or that, but for counsel's conduct, there is a reasonable probability the outcome of his trial would have been different. The record reflects that trial counsel effectively cross-examined Detective Freeman respecting his statement regarding defendant's body language indicating deception by pointing out that self-grooming and other body language are common, natural human behaviors of persons who are not lying. Defense counsel used the statement to undermine Detective Freeman's testimony and also effectively challenged his other testimony regarding facts pertinent to the murder investigation. The record reflects that defendant's trial counsel made strategic decisions in this regard. Defendant has not met his burden to overcome the presumption that his counsel acted from a sound trial strategy. Even assuming that his counsel performed deficiently by not objecting to the question or the witness's response, we are not persuaded that, but for counsel's conduct the outcome of defendant's trial would have been different. The prosecution presented substantial other evidence from which the jury could find defendant guilty of the charged offense beyond a reasonable doubt.

Defendant next argues that the prosecution committed misconduct by arguing facts not in evidence or misrepresented evidence in closing argument making his trial unfair. Alternatively, defendant argues that his trial counsel provided ineffective assistance by not objecting to the prosecution's conduct.

In cases alleging prosecutorial misconduct, issues are "preserved by contemporaneous objections and requests for curative instructions . . . ." *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017) (quotation marks and citation omitted). In *People v Lane*, 308 Mich App 38, 62; 862 NW2d 446 (2014) this Court explained:

> This Court will not reverse a conviction on the basis of prosecutorial misconduct unless the defendant "timely and specifically" challenged the alleged misconduct before the trial court or unless a failure to review the issue would result in a miscarriage of justice. We review unpreserved claims of prosecutorial misconduct for plain error. We will not find error requiring reversal if a curative instruction could have alleviated the effect of the prosecutor's misconduct. [Citations omitted.]

Regarding this claim of error, defendant neither objected to the alleged prosecutorial misconduct nor requested a curative instruction. As a result, this issue is not preserved for this Court's review. *Id*. Accordingly, we review for plain error under the standards set forth above. *Carines*, 460 Mich at 763. To establish that a defendant's substantial rights were affected, defendant must prove that the error caused him "prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764.

Respecting defendant's alternative argument of ineffective assistance of counsel regarding this issue, defendant did not raise it in the evidentiary hearing below. "Where, as here, there has been no evidentiary hearing on the issue below . . . our review is limited to errors apparent on the record." *Seals*, 285 Mich App at 19-20.

"We must evaluate instances of prosecutorial misconduct on a case-by-case basis, reviewing the prosecutor's [actions] in context and in light of the defendant's arguments." *Lane*, 308 Mich App at 62-63. "Generally, prosecutors are accorded great latitude regarding their arguments and conduct." *Bahoda*, 448 Mich at 282 (quotation marks, alteration, and citation omitted). "They are free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Id*. (quotation marks, alteration, and citation omitted). In making those arguments, "[t]he prosecutor need not speak in the blandest of all possible terms." *People v Blevins*, 314 Mich App 339, 355; 886 NW2d 456 (2016) (quotation marks and citation omitted). "Although a prosecutor may not argue facts not in evidence or mischaracterize the evidence presented, the prosecutor may argue reasonable inferences from the evidence." *People v Anderson*, 331 Mich App 552, 565; 953 NW2d 451 (2020) (quotation marks and citation omitted).

Defendant argues that, during closing argument, the prosecution misrepresented a witness's testimony regarding an incident during her visit with the victim when a man came to the victim's house seeking work. Comparison of the prosecution's statements during closing argument with the witness's testimony reveals that the witness did not testify that the man was defendant, nor did she testify that the victim told her that she had concern that turning the man away would make him angry. While there was enough evidence from which one could infer that the man in question was defendant, the prosecutor's argument did not suggest that the jury could draw such an inference but attributed to the witness identification of defendant as the man. If the prosecution had argued simply that defendant had come to the victim's house for work and she denied him, such an argument would have been permissible as argument for a reasonable inference from the evidence. *Anderson*, 331 Mich App at 565. The prosecution, however, argued that the witness testified that the man was defendant. That constituted error because the fact was not supported by the evidence. The prosecution's argument that the victim worried that she angered defendant by refusing to give him work similarly attributed to the witness testimony she did not give at trial. The witness said only that the victim felt uncomfortable with the unidentified man continuing to come around. Because the prosecution did not base this argument on admitted evidence, the prosecution made an improper argument. Defendant has established that plain error occurred.

-17-

Because this issue is unpreserved, however, defendant must prove his substantial rights were affected by the error to warrant reversal of his conviction. *Carines*, 460 Mich at 763. Defendant must establish "prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. The record does not support defendant's claim that his substantial rights were affected. The prosecution's argument regarding these two facts was short, not repeated, and relatively insignificant. Further, the trial court instructed the jury to decide the case based on the evidence and instructed them to not consider the arguments of the lawyers as evidence. "Jurors are presumed to follow the trial court's instructions, and instructions are presumed to cure most errors." *Mullins*, 322 Mich App at 173. Because any possible prejudice was minimal, the trial court's instruction worked to cure any residual prejudice caused by the prosecution's improper argument. *Id*. Accordingly, defendant has failed to establish his substantial rights were affected by the prosecution's errors and he is not entitled to reversal. *Carines*, 460 Mich at 763.

Defendant next claims plain error occurred as a result of the prosecution's argument that the victim was last seen alive on Thanksgiving 2017. Defendant contends that the prosecution committed misconduct because the prosecution ignored or failed to admit exculpatory evidence showing that a witness saw the victim checking her mail on the Saturday after Thanksgiving 2017. The prosecution does not dispute stating that the victim was last seen alive on Thanksgiving Day 2017. Instead, the prosecution disputes the misconduct claim because the record supported the argument. "Although a prosecutor may not argue facts not in evidence or mischaracterize the evidence presented, the prosecutor may argue reasonable inferences from the evidence." *Anderson*, 331 Mich App at 565 (quotation marks and citation omitted). Although defendant impliedly acknowledges the evidence presented to the jury supported the prosecution's argument in this regard, he argues nevertheless that the prosecution ignored evidence outside of the record that showed the victim remained alive on the Saturday after Thanksgiving 2017. The record, however, establishes that a witness saw the victim speaking to a man on her porch on Thanksgiving 2017. No other witness testimony at trial established that the victim remained alive on any day after that. The prosecution's argument that the victim was last seen alive on Thanksgiving 2017 was supported by facts in evidence, and therefore, defendant's claim of prosecutorial misconduct fails.

Defendant also argues generally that the prosecution failed to seek justice. He alleges that the prosecution ignored a witness's statement about the victim being seen alive on the Saturday after Thanksgiving because such did not support the prosecution's theory that defendant killed the victim on Friday. For this argument, defendant relies on statements in an investigator's report and the death scene investigation report which are not part of the lower court record. "[A] party may not expand the record on appeal, which consists of the original papers filed in that court or a certified copy, the transcript of any testimony or other proceedings in the case appealed, and the exhibits introduced." *People v Gingrich*, 307 Mich App 656, 659 n 1; 862 NW2d 432 (2014) (quotation marks and citation omitted). Because defendant cannot support his claim without reference to statements referenced in documents outside the trial court record, his claim fails. *Id*.

Defendant alternatively argues that his trial counsel provided ineffective assistance by failing to call a witness who purportedly saw the victim alive on the Saturday after Thanksgiving in 2017. As discussed previously, "to receive a new trial on the basis of ineffective assistance of counsel, a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland*, 466 US at 688, 694. As this Court has noted, "[d]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Muhammad*, 326 Mich App 40, 66; 931 NW2d 20 (2018) (quotation marks and citation omitted; alteration in original). Further, "the defendant [also] necessarily bears the burden of establishing the factual predicate for his claim." *Cooper*, 309 Mich App at 80 (quotation marks and citation omitted).

This argument suffers fatally from the lack of documentary support in the lower court record for defendant's claim. Defendant is not permitted to expand the record on appeal, *Gingrich*, 307 Mich App at 659 n 1, and yet is also responsible for establishing the factual predicate for his claim of ineffective assistance of counsel, *Cooper*, 309 Mich App at 80. Defendant's purported factual predicate—the investigator notes and death scene investigation report—are outside of the record, and therefore, cannot be considered by this Court. *Gingrich*, 307 Mich App at 659 n 1. Defendant has not established a factual predicate supporting his claim which is fatal to defendant's claim of ineffective assistance of counsel.

Defendant argues next that the trial court erred by denying his request for a new jury panel because, during voir dire in response to a question whether he knew defendant or defense counsel, a potential juror, a deputy sheriff who worked at the county jail, stated that he saw both every day at work, which defendant contends indicated to the potential jurors that defendant was in jail, which he contends violated his right to the presumption of innocence. This presents a question of constitutional law that we review de novo. *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018).

In *People v Horton*, 341 Mich App 397, 401-402; 989 NW2d 885 (2022), this Court explained:

> The United States Constitution and the Michigan Constitution each guarantee that a criminal defendant receives due process of law. US Const, Am XIV; Const 1963, art 1, § 17. Implicit in this guarantee is that each criminal defendant enjoys the right to a fair trial, and essential to a fair trial is the defendant's right to be presumed innocent. *People v Johnson*, 315 Mich App 163, 179; 889 NW2d 513 (2016) (citation omitted). "Under the presumption of innocence, guilt must be determined solely on the basis of the evidence introduced at trial rather than on official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *People v Rose*, 289 Mich App 499, 517; 808 NW2d 301 (2010) (quotation marks and citation omitted).
>
> The idea that criminal defendants cannot be forced to appear before the jury in jail garb was first recognized in Michigan when our Supreme Court decided *People v Shaw*, 381 Mich 467; 164 NW2d 7 (1969). The Court stated that defendants are "entitled to wear civilian clothes rather than prison clothing" because it is important that a defendant "be brought before the court with the appearance, dignity, and self-respect of a free and innocent man . . . ." *Id*. at 474 (quotation marks and citation omitted). The United States Supreme Court

subsequently recognized the right of criminal defendants to be tried in civilian clothing in *Estelle v Williams*, 425 US 501; 96 S Ct 1691, 48 L Ed 2d 126 (1976). "This is a recognition that the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." *Id*. at 504-505.

Although *Horton* concerned a defendant appearing in jail garb during trial, the principles stated apply in the present case, at least in part. Pertinently, the main concern regarding a defendant attending trial while wearing a jail jumpsuit is that his right to be presumed innocent would be affected because jurors might presuppose guilt from the fact the defendant was in jail. *Id*.

In this case, toward the end of the first day of jury selection, the deputy sheriff was called as a potential juror. The deputy sheriff stated that he worked in the jail, not on road patrol. When asked if he knew anyone involved in the case, the deputy sheriff said he saw defendant and his counsel on a daily basis. Defendant and the prosecution agreed that some other potential jurors became alert when the deputy sheriff made the statement. After a bench conference, the trial court excused the deputy sheriff for cause. Defendant objected to the information being exposed to the potential jurors, claiming it violated his right to be presumed innocent. Defendant urged the trial court to dismiss any potential jurors who heard the comment and start fresh with a new venire. The trial court refused for an array of reasons, including that the reference to defendant being in jail required the jury to make an inference, the comment was brief and glossed over by the parties, most reasonable jurors understood someone accused of murder awaited trial in jail, and a mere comment did not comport with traditional caselaw related to a defendant wearing jail garb throughout trial.

In *Horton*, 341 Mich App at 402, this Court considered the propriety of admitting video evidence that showed the defendant in his jail garb and whether doing so undermined the presumption of innocence. *Id*. This Court concluded that seeing a defendant in jail clothing on video substantively differed from a defendant's appearing for an entire trial while wearing a jail jumpsuit, and explained that no authority supported the defendant's argument that such undermined the presumption of innocence. *Id*. at 402-403. This Court held that the playing of the video did not "violate the constitutional guarantees of due process." *Id*. at 402.

This case is similar to *Horton* and not cases where a defendant wore jail garb throughout trial. Indeed, this case involves even fewer concerning factors than did *Horton*. The jury in *Horton* actually saw defendant in jail clothing, albeit on video. In this case, only some of the ultimate jurors heard a potential juror say he worked in the jail and saw defendant. The statement resulted in the potential juror being excused for cause. That some jurors heard the statement does not establish that impacted defendant's presumption of innocence or denied him a fair trial. We conclude that the brief statement regarding defendant being in jail did not affect the fairness of defendant's trial or undermine the presumption of innocence equivalent to being required to go through an entire trial dressed in jail garb. Accordingly, as in *Horton*, defendant is not entitled to relief.

Defendant also argues that selection of the jury under the procedures used during the COVID-19 pandemic deprived him of his constitutional right to trial by a fair cross section of the community. Defendant's argument lacks merit.

"[T]o properly preserve a challenge to the jury array, a party must raise the issue before the jury is empaneled and sworn." *People v McKinney*, 258 Mich App 157, 161; 670 NW2d 254 (2003). Defendant did not raise his claim of a violation of his right to have a jury chosen from a fair cross section of the community until his motion for a new trial. He did not, as a result, "raise the issue before the jury is empaneled and sworn." *Id*. Thus, this issue is unpreserved. *Id*.

Issues addressing systematic exclusion of a distinctive group "in jury venires are generally reviewed de novo." *Id*. However, "[u]npreserved claims of constitutional error are reviewed for plain error affecting a defendant's substantial rights." *People v Brown*, 326 Mich App 185, 192; 926 NW2d 879 (2018). The test is as set forth above. *Carines*, 460 Mich at 763. To show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*.

"A defendant has the right to be tried by an impartial jury drawn from a fair cross section of the community." *People v Jackson*, 313 Mich App 409, 428; 884 NW2d 297 (2015), citing US Const Am VI; Const 1963, art 1, § 20; *People v Bryant*, 491 Mich 575, 595; 822 NW2d 124 (2012), cert den 568 US 1028 (2012). In *Bryant*, 491 Mich at 596-597, our Supreme Court reiterated the framework for considering alleged violations of that right, which the United States Supreme Court explained in *Duren v Missouri*, 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979):

> In *Duren*, the United States Supreme Court set forth a more substantive framework designed to evaluate fair-cross-section challenges. Specifically, to make a prima facie case of a violation of the Sixth Amendment's fair-cross-section requirement, a defendant must show:
>
> > (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

If a defendant successfully establishes a prima facie case by satisfying all three prongs above, "it is the State that bears the burden of justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest." *Duren*, 439 US at 368.

For the first prong, the United States Supreme Court identified, at least, "women and certain racial groups" as a "distinctive group" under *Duren*. *Holland v Illinois*, 493 US 474, 485; 110 S Ct 803; 107 L Ed 2d 905 (1990). Our Supreme Court held that, in considering the second prong of the above analysis, "a court must examine the composition of jury pools and venires over

time using the most reliable data available to determine whether representation is fair and reasonable." *Bryant*, 491 Mich at 599-600. Respecting the third prong of the *Duren* test, our Supreme Court explained "[a] systematic exclusion is one that is 'inherent in the particular jury-selection process utilized.' " *Bryant*, 491 Mich at 615-616, quoting *Duren*, 439 US at 366.

Defendant argues an array of distinctive groups of people were underrepresented as a result of the jury-selection procedures used during the COVID-19 pandemic. Defendant specifically identifies the elderly, "political liberals, Black Americans, Hispanic Americans, poor citizens, and women," as the distinctive groups he believes were systematically excluded from the jury-selection process. Because defendant has identified some "distinctive groups" expressly accepted by the United States Supreme Court—women and people who are black or Hispanic—this first prong of the *Duren* test is, at least in part, fulfilled. *Holland*, 493 US at 485.

To establish the second prong, defendant must prove "that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community[.]" *Bryant*, 491 Mich at 597, quoting *Duren*, 439 US at 364. To do so, "a court must examine the composition of jury pools and venires over time using the most reliable data available to determine whether representation is fair and reasonable." *Bryant*, 491 Mich at 599-600. Defendant moved in the trial court and this Court for an evidentiary hearing where he could subpoena witnesses and documentary evidence to support his claims. Both of those motions were denied. Given his inability to establish exact numbers for Genesee County venires during the pandemic, defendant has cited news articles, academic research, law review articles, and public surveys conducted by various pollsters. He insists that such shows political liberals, people of color, the poor, the elderly, and women were almost certainly underrepresented in venires formed during the pandemic.

Defendant contends that political liberals were more likely to take seriously the risks involved with contracting COVID-19, making them more likely to avoid jury service. He states that people of color and the elderly, who were disproportionately at risk of serious illness and death from the virus, similarly would have exercised any available option to abstain from becoming a member of a venire formed during the pandemic. He asserts that those living in poverty were more likely to be working in jobs deemed "essential" during the initial phases of the pandemic, and insists that such individuals likely voluntarily elected to work instead of attending jury service. Defendant also contends that caregivers, overwhelmingly women, were more likely to choose to be omitted from a venire to ensure that they did not endanger those for whom they provided care.

Defendant essentially admits that he cannot establish the second prong under *Bryant* and *Duren* without an evidentiary hearing. This is because the second prong requires proof about venires specific to Genesee County Circuit Court over an established period of time. *Bryant*, 491 Mich at 599-600. Defendant admits he cannot, without additional discovery, provide such specific statistical analysis. Although the articles provided by defendant state general information, on their own, such are insufficient to support a claim under the applicable test. *Id.* Defendant, however, regardless of the data he could potentially produce, could not establish the third prong of the *Duren* test. Defendant could not obtain the data he needs from the Jury Management Office in Genesee County. In a recent unpublished opinion of this Court, the panel specifically noted testimony from a representative of Genesee Circuit Court's jury board that the "department did not keep records regarding the racial composition of venires." *People v Wilson*, unpublished per curiam opinion of

the Court of Appeals, issued February 8, 2021 (Docket No. 348750), p 2. Consequently, remanding this case for defendant to seek information that supports his claim would not be fruitful, considering the apparent lack of official data kept by Genesee County.

Assuming without deciding whether defendant could potentially establish the second prong in an evidentiary hearing, his claim still fails under the third prong of the *Duren* test which requires him to prove the alleged " 'underrepresentation is due to systematic exclusion of the group in the jury-selection process.' " *Bryant*, 491 Mich at 597, quoting *Duren*, 439 US at 364. Even if an underrepresentation occurred, such does not necessarily mean that the underrepresentation was caused by a systematic exclusion. *Id*. Instead, "[a] systematic exclusion is one that is 'inherent in the particular jury-selection process utilized.' " *Bryant*, 491 Mich at 615-616, quoting *Duren*, 439 US at 366.

In an attempt to delineate between what is and what is not evidence of systematic exclusion, the United States Court of Appeals for the Second Circuit adopted the following principle: "There is systematic exclusion when the underrepresentation is due to the system of jury selection itself, rather than external forces." *United States v Rioux*, 97 F 3d 648, 658 (CA 2, 1996). This statement of law has been adopted by the District of Columbia Court of Appeals in *Israel v United States*, 109 A3d 594, 605 (DC, 2014). An array of United States District Courts similarly have done so. See *United States v Cole*, 583 F Supp 3d 1037, 1044 (ND Ohio, 2022); *United States v Elias*, 579 F Supp 3d 374, 382 (ED NY, 2022); *Joffe v King & Spalding, LLP*, 575 F Supp 3d 427, 434 (SD NY, 2021); *United States v Shine*, 571 F Supp 2d 589, 599 (D Vt, 2008). "The decisions of lower federal courts are not binding on this Court but may be considered persuasive." *People v Walker (On Remand)*, 328 Mich App 429, 444-445; 938 NW2d 31 (2019) (quotation marks and citation omitted). We find the principle of law adopted in *Rioux* and followed by federal lower courts persuasive because, as recognized in *Duren*, 439 US at 367, the primary concern is "systematic exclusion in the jury-selection process" itself, not various outside factors that might affect how certain groups of people interact with the jury-selection process. *Id*.

Courts applying the principle articulated in *Rioux* have held that "[t]he COVID-19 pandemic is an external force on the court system," *Cole*, 583 F Supp 3d at 1044, and thus, such COVID-based arguments fail under the third prong of *Duren*. See also *Elias*, 579 F Supp 3d at 382 ("[The third element] cannot be satisfied here . . . [because] the COVID-19 pandemic and the effects that it has had on in-person proceedings are external forces on the court.") (quotation marks, citation, and alteration omitted); *Joffe*, 575 F Supp 3d at 434 ("The COVID-19 pandemic and the effects that it has had on in-person proceedings are external forces for the purposes of *Duren*.").

Defendant does not cite, nor does review of caselaw from across the country reveal, any case where a court has found a violation of a defendant's fair-cross-section right as a result of holding a jury trial during the COVID-19 pandemic. Significantly, defendant claims that the pandemic, and not the process itself, caused the purported underrepresentation of certain groups in jury venires. We are unpersuaded that the jury-selection process in place in this case was not facially neutral. The effects of COVID-19 may have caused the alleged disparity in potential jurors. Therefore, even assuming defendant could produce proof of underrepresentation of distinctive groups in venires formed during the pandemic, his claim necessarily fails because any such underrepresentation occurred as a result of the pandemic itself, an external force, and not "[a]

-23-

systematic exclusion . . . 'inherent in the particular jury-selection process utilized.' " *Bryant*, 491 Mich at 615-616, quoting *Duren*, 439 US at 366. Accordingly, defendant is not entitled to relief.

Defendant also argues that requiring him to either wear a mask or sit six feet away from his attorney denied him a fair trial and infringed his right to confront witnesses against him. He essentially contends that the wearing of a mask may have impacted in the minds of jurors the presumption of innocence and prevented face-to-face confrontation with witnesses because they could avoid viewing him as they gave their testimony. We find no merit to these arguments.

Both aspects of this issue, whether wearing a mask deprived defendant of his right to the presumption of innocence or denied his right to confront witnesses, are constitutional questions that this Court reviews de novo. *Bruner*, 501 Mich at 226. To the extent this Court finds that a constitutional error has occurred, "[w]e review preserved issues of constitutional error to determine whether they are harmless beyond a reasonable doubt." *People v Dendel (On Second Remand)*, 289 Mich App 445, 475; 797 NW2d 645 (2010). "A constitutional error is harmless if [it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id*. at 475 (quotation marks and citations omitted).

A defendant "is entitled to a fair trial but not a perfect one for there are no perfect trials." *People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008). Defendant challenges procedures meant to protect human life during the recent public health crisis. As this Court explained in *Horton*, 341 Mich App at 401:

> Implicit in [the due process] guarantee is that each criminal defendant enjoys the right to a fair trial, and essential to a fair trial is the defendant's right to be presumed innocent. *People v Johnson*, 315 Mich App 163, 179; 889 NW2d 513 (2016) (citation omitted). "Under the presumption of innocence, guilt must be determined solely on the basis of the evidence introduced at trial rather than on official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *People v Rose*, 289 Mich App 499, 517; 808 NW2d 301 (2010) (quotation marks and citation omitted).

In two recent unpublished cases, this Court considered whether COVID-19 protocols, including mask wearing, violated a party's right to a fair trial. In both cases, this Court concluded that the arguments lacked merit. Unpublished opinions of the Court of Appeals are not binding upon this Court, but may be persuasive. *People v Daniels*, 311 Mich App 257, 268 n 4; 847 NW2d 732 (2015). In *People v Bogan*, unpublished per curiam opinion of the Court of Appeals, issued March 17, 2022 (Docket No. 355649), this Court addressed a claim regarding jurors masking. The panel summarized, "[i]n short, defendant has provided no basis to conclude that the implementation of the contested masking and physical-distancing protocols denied him a fair trial." *Id*. at 5. In *Collins v Nizzi*, unpublished per curiam opinion of the Court of Appeals, issued January 20, 2022 (Docket Nos. 354510 and 354871), this Court addressed whether the plaintiff in a civil matter was "denied a fair trial because jurors wore face masks that covered their mouth and nose during voir dire and during trial, the attorneys wore such masks during trial, and certain witnesses wore face masks while testifying during video depositions." *Id*. at 4. The panel noted that masks were worn in conformity with COVID-19 safety protocols. *Id*. The panel concluded that the plaintiff "presented no caselaw or other support for his argument that the trial court

reversibly erred when it permitted prospective jurors to wear masks during voir dire and during trial, or that plaintiff has been deprived of due process where some of the witnesses may have worn masks during trial." *Id*. at 7.

In this case, defendant suggests that the jury likely disregarded the presumption of innocence because he wore a mask covering his nose and mouth. Defendant notes that, historically wearing a face mask, such as bandits wearing bandanas over their faces, evidences criminality. Defendant ignores, however, that at the time of his trial, wearing masks had become a normal part of functioning in society. Face masks were being worn in conformity with national, if not global, safety protocols against the COVID-19 pandemic. Defendant has presented nothing to overcome the presumption that jurors are impartial. See *Miller*, 482 Mich at 550. Defendant merely speculates that his wearing a mask harmed his right to a fair trial. We are not persuaded that defendant suffered a violation of his fair-trial right.

Defendant alternatively argues that the trial court violated his right to confront the witnesses against him by requiring him to wear a mask. "A defendant has the right to be confronted with the witnesses against him or her." *People v Yost*, 278 Mich App 341, 369-370; 749 NW2d 753 (2008), citing US Const, Am VI; Const 1963, art 1, § 20; *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004). "The purpose of the Confrontation Clause is to provide for a face-to-face confrontation between a defendant and his accusers at trial." *People v Bean*, 457 Mich 677, 682; 580 NW2d 390 (1998) (quotation marks and alterations omitted). "This confrontation is an important right of the defendant because it enables the trier of fact to judge the witnesses' demeanors." *People v Dye*, 431 Mich 58, 64; 427 NW2d 501 (1988) (opinion by LEVIN, J.), cert den 488 US 985 (1988). According to the United States Supreme Court, "the Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Coy v Iowa*, 487 US 1012, 1018; 108 S Ct 2798; 101 L Ed 2d 857 (1988) (quotation marks, alterations, and citation omitted).

Defendant contends the "face-to-face" confrontation guarantee cannot be fulfilled when a defendant is required to wear a mask. In this case, the record indicates that, for safety reasons, the trial court gave defendant a choice between wearing a mask or sitting at a distance from his trial counsel. Defendant chose to wear a mask. Relevant to this dispute, the record indicates that the witnesses removed their masks when they were on the stand and testifying. When defense counsel cross-examined the witnesses, he also removed his mask. Defendant insists that, because he had to wear a mask, the witnesses were allowed to provide testimony without viewing him. Defendant relies on *Coy*, 487 US at 1020, which involved the use of a screen "specifically designed to enable the complaining witnesses to avoid viewing appellant as they gave their testimony, and the record indicates that it was successful in this objective." The Supreme Court held that violated the defendant's confrontation right. *Id*. at 1022.

*Coy* is distinguishable from the case at bar. Nothing blocked the witnesses' view of defendant during trial in this case nor interfered with his view of the witnesses testifying. While defendant's nose and mouth were covered by a cloth mask, his eyes and upper face were visible. The decision in *Coy* relied on complaining witnesses being provided a physical obstruction from viewing the defendant altogether. A cloth mask covering only part of defendant's face is not the same as a barrier to view. Defendant remained physically in the room with the witnesses, they

could see him, he could see them, and they underwent cross-examination by his unmasked counsel. The Supreme Court's decision in *Coy*, 487 US at 1020-1022, does not mandate a conclusion that mask wearing during a pandemic violates the Confrontation Clause. Courts in other jurisdictions that have considered this question have concluded the same. See, e.g., *Guerin v Commonwealth*, 658 SW2d 481, 485 (Ky App, 2022) ("In this case, each witness testified under oath, the witnesses were unmasked during their testimony at trial, and their statements were subject to [the defendant's] cross-examination. Thus, [the defendant] was afforded the full protection of the Confrontation Clause."); *United States v Crittenden*, opinion of the United States District Court for the Middle District of Georgia, issued August 21, 2020 (Case No. 4:20-CR-7), p 6 (reasoning that requiring masks is dissimilar to the situation in *Coy* considering the lack of a physical barrier separating the defendant from the witnesses, and holding "[t]here is no reason to believe that it is any less difficult to tell a lie to a person's face just because the liar's nose and mouth are covered."). We find these cases persuasive. Defendant's arguments lack merit.

Defendant argues further that the trial court's decision to hold the trial during the COVID-19 pandemic resulted in an unreasonably high risk that the jury would return a coerced verdict because of fears of contracting the virus or resentment against defendant for insisting on trial during the pandemic. "Whether defendant was denied his [constitutional] right to an impartial jury . . . is a constitutional question that we review de novo." *Bryant*, 491 Mich at 595.

Defendant essentially conjectures that his right to a fair and impartial jury was violated because the jurors were likely more concerned about the pandemic than rendering a truthful verdict. This Court in *Dunigan*, 299 Mich App at 586 (quotation marks and citation omitted), stated that claims of misconduct on behalf of jurors, "even if the alleged misconduct did actually occur, will not warrant a new trial unless the party seeking the new trial can show that the misconduct [was] such as to affect the impartiality of the jury or disqualify them from exercising the powers of reason and judgment." "During their deliberations, jurors may only consider the evidence that is presented to them in open court." *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997). "Where the jury considers extraneous facts not introduced in evidence, this deprives a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment." *Id*.

To be successful in a claim regarding extraneous information obtained by the jury, a defendant has the burden to show both that "the jury was exposed to extraneous influences," *id*., and "that there was 'a real and substantial possibility that [the extraneous influences] could have affected the jury's verdict.' " *People v Haynes*, 338 Mich App 392, 415; 980 NW2d 66 (2021), quoting *Budzyn*, 456 Mich at 89. "Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict." *Budzyn*, 456 Mich at 89.

Defendant contends that the COVID-19 pandemic constituted the extraneous influence in this case. He insists that fear of the virus caused the jurors to fail to pay attention to the evidence, prejudge him for insisting on going to trial during a pandemic, refuse to engage in typically close-knit jury deliberations, and feel coerced to simply reach a verdict as soon as possible to escape the courtroom. The record in this case does not support defendant's contentions which merely rest on his speculation.

Defendant states the jurors likely did not pay attention during trial because of overwhelming fear of the virus. The record shows, as defendant plainly admits, the jury selection allowed jurors overly fearful of COVID-19 to opt out of jury service. Thus, it stands to reason that defendant's jury was comprised of individuals who were not so afraid of the virus that they would abandon their sworn oaths as jurors and ignore evidence in the case. Moreover, the trial court exhaustively explained that the protocols served the purpose of ensuring juror safety as well as the safety of all others involved in the proceedings. The jurors were seated six feet apart, they each had their own set of personal protection equipment, and the parties were required to bring enough copies of documentary exhibits to provide one for each juror. Nothing in the record indicates that any juror failed to pay attention, let alone because of fear of COVID-19. Because defendant has failed to provide factual proof of this claim, it must fail. "As the appellant[], defendant [bears] the burden of furnishing the reviewing court with a record to verify the factual basis of any argument upon which reversal [is] predicated." *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). Defendant has failed to do so.

Next, defendant argues that the jurors might have held against him his decision to go to trial in the midst of the pandemic. Once again, nothing in the record indicates that the jurors did so. Because defendant has failed to provide this Court with factual proof of his claim, it fails. *Id*. Moreover, the jurors were instructed by the trial court that they were to consider only evidence admitted at trial. "Jurors are presumed to follow the court's instructions, and instructions are presumed to cure most errors." *Mullins*, 322 Mich App at 173.

Defendant also asserts that the jury likely did not engage in close-knit deliberations for fear of contracting COVID-19. Defendant has not cited to anything in the record to support his assertion. Indeed, the trial court took steps to ensure the jurors had proper space to deliberate, moving them from the smaller jury room to an empty courtroom. The trial court gave the jurors the option of spreading out while not wearing masks, or convening together while wearing masks. Defendant relies solely on speculation and has provided nothing to support his assertion. Absent some evidence to support his claim, defendant's argument must fail. *Elston*, 462 Mich at 762; *People v Fletcher*, 260 Mich App 531, 540; 679 NW2d 127 (2004).

Defendant also argues that the jury likely convicted him as soon as possible to end their deliberations and reduce potential exposure to COVID-19. The record, however, establishes that the trial court took extraordinary steps to ensure juror safety, which included masking and social distancing rules during deliberations. The record also indicates that the jury deliberated for nearly 10 hours. Such extensive, lengthy deliberations demonstrate that the jurors in this case took very seriously their duty and did not hastily jump to judgment based upon external influences. Defendant has failed to present any evidence that the jurors in his case disregarded their duty to deliberate fairly because of COVID-19.

For the reasons set forth above, the matter is affirmed.

/s/ James Robert Redford
/s/ Noah P. Hood